UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| ZURICH AMERICAN INSURANCE COMPANY, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) NO. 3:17-cv-00856 ) CHIEF JUDGE CRENSHAW ) |
| CARDIOVASCULAR CARE GROUP, INC., | ) ) ) |
| Defendant. | ) ) |

## MEMORANDUM OPINION

This is a simple contract case in which Zurich American Insurance Company ("Zurich") seeks to recover unpaid premiums and deductibles from policyholder Cardiovascular Care Group, Inc. ("CCG"). Before the Court is Zurich's Motion for Summary Judgment (Doc. No. 31), to which CCG has responded (Doc. No. 37) and Zurich has replied (Doc. No. 40). The Court also ordered supplemental briefing on certain limited issues. (Doc. Nos. 48, 49, 51, 52.)

The essential material facts advanced by Zurich are undisputed. (See Doc. No. 42 at ¶¶ 3-21, 23, 25.) Zurich issued two policies of workers' compensation and employer's liability insurance to CCG (the "2014 Policy" and "2015 Policy," or, together, the "Policies"). (Id.) The total amount due and owing from CCG to Zurich under the Policies is $421,983.80, which is comprised of $266,729 for unpaid audit premiums, and $155,254.80 for unpaid deductible invoices, issued between May 2015 and June 2018. (Id. at ¶ 25.)

In reviewing a motion for summary judgment, this Court will only consider the narrow question of whether there are "genuine issues as to any material fact and [whether] the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A motion for summary

judgment requires that the Court view the "inferences to be drawn from the underlying facts . . . in the light most favorable to the party opposing the motion." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (quoting United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)). "The party bringing the summary judgment motion has the initial burden of informing the Court of the basis for its motion and identifying portions of the record that demonstrate the absence of a genuine dispute over material facts." Rodgers v. Banks, 344 F.3d 587, 595 (6th Cir. 2003). After the movant has satisfied this initial burden, the nonmoving party has the burden of showing that a "rational trier of fact [could] find for the non-moving party [or] that there is a 'genuine issue for trial.'" Matsushita, 475 U.S. at 587. If the evidence offered by the nonmoving party is "merely colorable," or "not significantly probative," or not enough to lead a fair-minded jury to find for the nonmoving party, the motion for summary judgment should be granted. Anderson, 477 U.S. at 479-52. "A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate." Hill v. White, 190 F.3d 427, 430 (6th Cir. 1999) (citing Anderson, 477 U.S. at 247-49).

To be clear, by virtue of its response to Zurich's Motion, CCG concedes that it has not remitted payment for the $421,983.80 of audit premiums and deductibles for the 2014 Policy and 2015 Policy that it owes to Zurich. (Doc. No. 37 at 1.) However, CCG advances a defense. Specifically, CCG contends that it has "no liability" to Zurich in this action because Zurich's only recourse is to recover the amounts it "claims are due" from cash collateral pledged by means of a separate agreement between Zurich and CCG.

On July 1, 2014, Zurich and CCG entered into the Paid Deductible Agreement ("PDA"). (Doc. No. 42 at ¶ 28.) Broadly speaking, the PDA is a somewhat typical risk financing arrangement in which one party to ongoing financial dealings is required to set aside cash as collateral to balance

the financial risk borne by the other party. (Doc. No. 41-1 at 2.) Under the PDA, CCG obtained a letter of credit from Bank of America, listing Zurich as the beneficiary, and secured the letter of credit by depositing funds in a certificate of deposit ("CD") maintained by that bank. (Id. at ¶¶ 30-31.) The letter of credit remains in effect and the balance of the CD is about $440,000. (Id. at ¶ 32.) In sum, the Policies and the PDA comprise part of an overall program of insurance that Zurich has provided to CCG since 2014. (Doc. Nos. 51 at 2; 41-1 at 2.) As relevant here, CCG claims (1) it has "effectively" paid Zurich by making available collateral that could constitute payment for the full balance claimed to be owing, and (2) Zurich is required to take that collateral as payment, and the fact that Zurich refuses to do so does not "create" liability on behalf of CCG. (Doc. No. 37 at 4-5.)

CCG's argument fails for multiple reasons. First, CCG does not offer any legal precedent to support its claim that existing collateral is an "effective payment" or that CCG's "effective payment" is a valid or recognized defense against Zurich's claims of breach of contract or account stated. CCG has not offered any authority to support the contention that, absent a requirement that Zurich must avail itself of the collateral, Zurich is not entitled to a judgment in its favor for the amounts due and owing.

Second, the 2014 Policy and 2015 Policy, which may only be modified by endorsements, do not contain *any* requirement that Zurich draw on the PDA in *any* circumstance. (See Doc. Nos. 36-2, 36-3.) The Policies explicitly state: "The only agreements relating to this insurance are stated in this policy. The terms of this policy may not be changed or waived except by endorsement issued by us to be part of this policy." (Doc. Nos. 36-2 at 12; 36-3 at 13.) However, the PDA is not listed on the Schedule of Forms of Endorsements for either Policy. (Id.) The PDA – a separate and discreet agreement – therefore cannot, and does not, create *any* obligation for Zurich under the

Policies. If the parties wanted their conduct under the Policies to be governed by the PDA, they could have included the PDA as an endorsement, but they did not. Despite its rhetoric to the contrary, CCG implicitly acknowledges this fact by only arguing that, under the Policies, Zurich "may," "can," or "could" use the collateral set aside by the PDA, not that it "must" do so under any actual requirement. (See, e.g., Doc. No. 49 at 3.) To the contrary, the 2014 Policy and 2015 Policy *require* CCG to promptly pay Zurich the balances that are the subject of this lawsuit. (See, e.g., Doc. Nos. 36-2 at 16 (audit premium), 36-2 at 49-52 (deductibles); 36-3 at 17 (audit premium), 36-3 at 55-59 (deductibles).) Moreover, the 2014 Policy and 2015 Policy do not require Zurich to resolve disputes related to the Policies in any particular manner.[1]

Third, in parallel to the Policies, the PDA also repeatedly acknowledges CCG's obligation to *remit payment* to Zurich for audit premiums and deductibles. (Doc. Nos. 41 at ¶ 9, 41-1 at 1-3.) *Nowhere* does the PDA require that Zurich must use the available collateral to make up for CCG's deficient payment obligations for audit premiums and deductibles. Indeed, under this illogical reading, CCG could essentially ignore its bills from Zurich and permanently direct Zurich to the PDA, whether or not the collateral remained fully funded. This understanding of the overall arrangement between the parties makes little sense. Rather, the PDA sets forth *additional obligations* CCG owes to Zurich, and Zurich simply "reserve[s] the right" to draw on the collateral, if it chooses, in the event CCG defaults on payment obligations regarding an amount that "is or may become due."[2] (Doc. No. 41-1 at 5-6.) Indeed, the PDA does not require Zurich to draw down

---

[1] As CCG notes (Doc. No. 49 at 1-2), the Policies do reference arbitration of disputes related to the CCG's obligations under the collateral fund, but that is not at issue here because Zurich has not alleged that CCG has failed to meet any obligations under the PDA and CCG has not moved for arbitration.

[2] CCG tries to make hay out of a statement by its Controller Christine Sochko that "Zurich advised that it would only issue the requested policy if CCG posted collateral that Zurich could

on the collateral at *any* specific time *ever*. (Doc. No. 41-1.) Rather, the terms of the PDA provide that the collateral is made available to generally secure CCG's "financial obligations," which also include future audits, deductibles, and reserves.[3] (Doc. Nos. 41-1 at 4-5; 41 at ¶¶ 9, 12-15.) Finally, again mirroring the Policies, the PDA contains *no* provision stating that Zurich agreed to waive *any* right to sue CCG for past due obligations in lieu of drawing on the collateral. (Doc. No. 41-1.) If the parties to the PDA wanted it to be the exclusive means for the payment of past due balances, they could, and should, have so specified by the terms of the unambiguous agreement. Instead, the PDA is silent as to Zurich's alternate remedies at law against CCG.[4]

It may very well be the case, as CCG stresses, that Zurich would not have issued the Policies if CCG had not entered into the PDA. But that does not control the outcome of this case. In the end, CCG may be disappointed that Zurich did not accept its invitation to use the PDA collateral to recover the unpaid balances for the 2014 Policy and 2015 Policy, and Zurich's choice to not do so might even have been a surprise to CCG, but Zurich was under no contractual

---

use for payment of the amounts due under the policy." (Doc. Nos. 39 at ¶ 3; 37 at 5; 42 at ¶ 27.) This is unconvincing, for three reasons. First, the PDA is unambiguous, and so reference to such extrinsic evidence is not necessary or appropriate. Second, it is unsupported hearsay. Third, Ms. Sochko only asserts that Zurich wanted collateral that it "could" use to cover payments, not "must" use for payments, as CCG now contends. Even if this business motivation for entering into the PDA described by Sochko were true, it would not forestall this lawsuit.

[3] As just an example, the 2014 Policy and 2015 Policy will convert to incurred policies in the next year and CCG will become liable for a substantial additional amount of reserves.

[4] Zurich has stated in supplemental briefing dated September 10, 2018, that it intends to draw on the PDA collateral to satisfy audit premiums and deductibles owed in connection with another policy – the 2016 Policy – in the amount of $369,161, thereby substantially depleting the $440,000 collateral fund and illustrating Zurich's point that there isn't enough money in the PDA collateral for everything that CCG does or will owe Zurich. The legal question before the Court remains live, however, because approximately $70,000 remains in the collateral fund.

obligation to draw on that collateral. The PDA was created as a *shield* for *Zurich*, and, as written, *CCG* cannot use it as a *sword*.

CCG is contractually liable to Zurich for the amount sought in this lawsuit. Zurich will be **GRANTED** summary judgment on Counts One and Three of the Complaint and awarded a final judgment against CCG for the undisputed amount of $421,983.80.[5]

An appropriate order will enter.

*[signature]*
WAVERLY D. CRENSHAW, JR.
CHIEF UNITED STATES DISTRICT JUDGE

---

[5] Based on the Court's ruling as to Counts One and Three, the motion will be **DENIED AS MOOT** regarding Count Two (unjust enrichment). In addition, Zurich has, without discussion, asked for pre-judgment interest in its supplemental briefing. The Court declines to entertain the request at this time. "[S]tate law governs awards of prejudgment interest." F.D.I.C. v. First Heights Bank, FSB, 229 F.3d 528, 542 (6th Cir. 2000). If it wishes, after the Clerk enters judgment, Zurich may bring an appropriate motion, with legal authority, under Federal Rule of Civil Procedure 59.